UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                             Criminal Action No. 12-20245

vs.                               HON. MARK A. GOLDSMITH

LARRY PHILLIPS,

    Defendant.
_____/

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO SUPPRESS (DKT. 16)**

**I.    INTRODUCTION**

Defendant Larry Phillips was indicted on a charge of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Indictment (Dkt. 10). Defendant filed a motion and brief to suppress evidence, including the firearms that are the basis of the current indictment. (Dkts. 16, 17.) The Government filed a response (Dkt. 19), and Defendant filed a reply (Dkt. 20). The Court conducted an evidentiary hearing, following which both parties submitted supplemental briefing (Dkts. 26, 27, 29, 30). For the reasons that follow, the Court grants the motion to suppress.

**II.    BACKGROUND**

On April 2, 2012, at approximately 10:00 p.m., Michigan State Police Trooper Dale Girke and his partner, Trooper Pat Barrigar, were on patrol in Flint, Michigan. Tr. at 4-5 (Dkt. 24). Trooper Girke testified that Flint City Dispatch "put a call out for shots fired coming from a person in the driveway of 5326 Baldwin." Id. at 5. The dispatch indicated that the person firing

1

shots was a black male wearing dark clothing, who was standing near a car parked in the driveway. Id. at 6.

Within two minutes of the dispatch, Troopers Girke and Barrigar arrived at 5326 Baldwin. Id. Trooper Girke testified that he saw a car backed into the driveway of this address, and he saw "a black male get off the trunk of the car and start walking to the side door of the house." Id. Trooper Girke testified that "[i]t looked like he went straight down into the house into the basement of the house." Id. at 7. This man was later identified as Defendant Larry Phillips. Id. at 9-10. Troopers Girke and Barrigar yelled to Defendant to stop and walk toward them, but Defendant continued into the house. Id. at 7-8. Trooper Girke was not able to determine whether Defendant had anything in his hands. Id. at 10. While the troopers were in the driveway, they saw four or five empty shell casings for firearms, along with one live round, within several feet of the car. Id. at 8.

Trooper Girke knocked on the door of the house, and Defendant's sister, Kadia Phillips, answered the door. Id. at 8-9. Kadia Phillips indicated that the owner of the house was her mother. Id. At this point, Defendant came upstairs from the basement and "started yelling." Id. at 10. Defendant did not have anything in his hands. Id. Defendant's mother, Mrs. Peggy Phillips, came to the door, and at approximately the same time, Flint police officers arrived. Id. at 11. Defendant's mother confirmed that she was the homeowner. Id. at 14.

Defendant was "enraged" and "telling [the officers] that the State Police is not coming into his F-ing house." Id. at 12. Trooper Girke testified that there was no doubt that Defendant refused to give consent to search the house, and that Kadia Phillips also refused consent. Id. at 18, 21, 27.

Trooper Barrigar patted down Defendant, and did not locate any firearms on him. Id. at

2

11. Trooper Barrigar also escorted Defendant to the patrol car to run a LEIN check. Id. at 22-23. Trooper Girke did not recall whether Defendant was put into the car or remained standing outside the car. Id. Defendant was outside at the point when Flint Police Officer Monica Jackson began speaking to Kadia Phillips and Mrs. Phillips. Id. at 13.

Flint Police Lieutenant Sergio Thomas arrived and also began speaking to Mrs. Phillips. Id. at 23. Lieutenant Thomas testified that he was summoned to 5326 Baldwin by Officer Jackson, and that when he arrived Officer Jackson told him that "a subject was outside firing a handgun," that the subject had run into the basement carrying a gun, and that Officer Jackson was in the process of asking the owner of the house for permission to search the house. Id. at 30, 40. Lieutenant Thomas then spoke to Mrs. Phillips. Id. at 30, 40. Lieutenant Thomas testified that when he first asked Mrs. Phillips for permission to search her basement for a handgun, she initially "didn't understand what was going on," and specifically "[s]he didn't understand why the police were there." Id. at 31. Lieutenant Thomas further testified that after he explained to Mrs. Phillips that they were at the house to search for a gun in the basement, she consented to a search of the residence. Id. at 32, 33.

Trooper Girke testified that when Mrs. Phillips gave consent for the Flint police to search the residence, Defendant left the immediate area and ran to a location several houses away:

> He ended up leaving when the mother started to give consent for -- they would not allow the State Police, but she said that Flint city officers could search the residence and at that time Mr. Phillips kind of took off running. He ran like two yards down and stayed there and met up with another individual.

Id. at 13. After speaking to Mrs. Phillips, the Flint police officers went inside the house to conduct a search, and the State Police troopers stayed outside the house. Id. at 14. The troopers did not detain Defendant while the search was in progress. Id.

Lieutenant Thomas and Officer Jackson went into the basement to conduct the search,

3

and Mrs. Phillips and Kadia Phillips followed them. Id. at 33. Officer Jackson found a gun holster near the couch. Id. at 35. Lieutenant Thomas found an assault rifle and a handgun, which he seized. Id. at 36-37.

### III. LEGAL STANDARD

The Fourth Amendment "is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (citation and quotation marks omitted). Warrantless searches "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted). "One of those well-delineated exceptions is the consent of the person searched. An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search. And one of the other exceptions is the existence of exigent circumstances." United States v. Purcell, 526 F.3d 953, 960 (6th Cir. 2008) (quotation marks and citations omitted).

At a suppression hearing, the government has the burden of demonstrating, by a preponderance of the evidence, that the search or seizure was not a constitutional violation. See United States v. Bradley, 163 F. App'x 353, 357 (6th Cir. Dec. 21, 2005) (citation omitted).

### IV. ANALYSIS

The Government purports to justify the warrantless search on the basis of Mrs. Phillips' consent and exigent circumstances. Defendant disputes these purported justifications on four grounds: (i) Mrs. Phillips' consent was the result of coercion or duress; (ii) Mrs. Phillips did not have actual or apparent authority to consent to a search of the basement; (iii) the objections of Defendant and Kadia Phillips, as co-residents, nullified any consent that Mrs. Phillips gave; and (iv) there were no exigent circumstances justifying the search. The Court concludes that

Defendant's clear objection to the search remained in force even after Defendant left the immediate vicinity, and that because Defendant was a co-resident of the house, his objection nullified the consent given by his mother. Because the Court determines that the search was invalid due to Defendant's objection, the Court does not reach Defendant's arguments regarding coercion, actual and apparent authority, and Kadia Phillips' objection. Finally, the Court concludes that there were no exigent circumstances justifying the search.

### A. Defendant's Objection to the Search

#### 1. Parties' arguments

Defendant argues that he resided at 5326 Baldwin in Flint, the address searched by the officers in this case, and that the "basement of the home was his private residence and he had a reasonable expectation of privacy" there. Def. Br. for Mot. to Supp. at 3 (Dkt. 17). Defendant contends that because he "adamantly refused to consent to a search of his dwelling place by the police," he was a physically present resident explicitly refusing consent, and therefore the police did not have the authority to enter and search under Georgia v. Randolph, 547 U.S. 103 (2006). Def. Br. for Mot. to Supp. at 7.

The Government argues that Georgia v. Randolph does not apply because Defendant voluntarily left the area. Gov't Resp. at 9-11 (Dkt. 19). The Government notes that there is a circuit split on the issue of whether a person's refusal to consent to a search remains effective after the person has been arrested and a co-resident grants consent. Id. at 9-10. The Government then argues "there should be little question that an objection is no longer valid if the objector voluntarily removes himself from the area." Id. at 10 (emphasis in original). The Government continues, "once the occupant leaves, social expectations shift, and the occupant assumes the risk that a co-occupant may allow the police to enter even knowing that the occupant would object or

continue to object if present." Id. The Government then argues that because Defendant voluntarily left the residence after his mother consented to the search, any objection he made to the search no longer remained in effect. Id. at 10-11.

In reply, Defendant contends that (i) the police made a calculated decision to remove Defendant from the residence to ensure he was no longer physically present and objecting, (ii) Defendant was taken into custody, in the back of a police car, without probable cause, and (iii) to the extent Defendant voluntarily left the residence, the "actions of the police sent a very clear message – stay away from the house." Def. Rep. at 1-2 (Dkt. 20).

### 2. Discussion

In Georgia v. Randolph, the Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. at 120. The Court explained:

> Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of consent at all.

Id. at 114. The Court stated that "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection." Id. at 120.

The Court clarified that the authority of a co-resident to admit the police in the absence of an objection derives from "customary social usage." Id. at 121. "[T]he question [is] whether customary social understanding accords the consenting tenant authority powerful enough to

6

prevail over the co-tenant's objection." Id. The Court concluded that, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." Id. The Court further held that third party consent to a search is only valid "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Id. at 121.

The Sixth Circuit has not yet taken a position on whether a co-resident's refusal of consent to officers remains in effect even if (i) the objecting co-resident later leaves or is removed, and (ii) another co-resident grants consent to the search. In United States v. Starnes, No. 11-3446, 2012 WL 4372560, at *8 (6th Cir. Sept. 26, 2012), however, the Sixth Circuit acknowledged the circuit split:

> A circuit split currently exists regarding whether or not a non-consenting resident may be physically removed so as to circumvent Randolph. See United States v. Tatman, 397 F. App'x 152, 166 n.6 (6th Cir.2010) (noting that the Seventh and Eighth Circuits have found that subsequent consent can trump one resident's refusal after physically removing the refusing resident from the premises, but that the Ninth Circuit has drawn the opposite conclusion (comparing United States v. Henderson, 536 F.3d 776, 783–84 (7th Cir.2008) and United States v. Hudspeth, 518 F.3d 954, 960–61 (8th Cir.2008) (en banc) to United States v. Murphy, 516 F.3d 1117 (9th Cir.2008)). We have yet to take a stand on this issue, and we need not do so today, because the government has failed to carry its burden to prove that Kim's consent was voluntary.

In United States v. Murphy, 516 F.3d 1117, 1124-1125 (9th Cir. 2008), the Ninth Circuit held that a co-tenant's objection to a search is not invalidated if the co-tenant leaves the premises and consent is subsequently given by another co-tenant:

> We hold that when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant.
>
> We find support for our holding in the Randolph Court's treatment of the related issue of police removal of a tenant from the scene for the purpose of

7

preventing him from objecting to a search. 547 U.S. at 121. The Court held that third party consent to a search is valid only "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." Id. If the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made. Nor, more generally, do we see any reason to limit the Randolph rule to an objecting tenant's removal by police. Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects. The rule that Randolph establishes is that when one co-tenant objects and the other consents, a valid search may occur only with respect to the consenting tenant. It is true that the consent of either co-tenant may be sufficient in the absence of an objection by the other, either because he simply fails to object or because he is not present to do so. Nevertheless, when an objection has been made by either tenant prior to the officers' entry, the search is not valid as to him and no evidence seized may be used against him. Rather, as in this case, in the absence of exigent circumstances, the police must obtain a warrant before conducting the search.

However, the Eighth and Seventh Circuits reached the opposite conclusion on this issue. The Eighth Circuit held:

> [W]hen Cpl. Nash asked for Mrs. Hudspeth's consent, Hudspeth was not present because he had been lawfully arrested and jailed based on evidence obtained wholly apart from the evidence sought on the home computer. Thus, this rationale for the narrow holding of Randolph, which repeatedly referenced the defendant's physical presence and immediate objection, is inapplicable here.
> . . . .
>    The Randolph opinion repeatedly referred to an "express refusal of consent by a physically present resident." Randolph, 547 U.S. at 120 (emphasis added); e.g., id. at 108, 109, 114, 121–23. The Randolph majority candidly admitted "we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search." Id. at 121 (emphasis added). Hudspeth was not at the door and objecting and does not fall within Randolph's "fine line."

United States v. Hudspeth, 518 F.3d 954, 960 (8th Cir. 2008). The Seventh Circuit came to the same conclusion on this issue:

> Like the Eighth Circuit, we see the contemporaneous presence of the objecting and consenting cotenants as indispensable to the decision in Randolph. Indeed, the fact of a conflict between present co-occupants plays a vital role in the Randolph majority's "social expectations" premise; a third party, attuned to societal customs regarding shared premises, would not, "[w]ithout some very

8

good reason," enter when faced with a disputed invitation between cotenants. Randolph, 547 U.S. at 113. The calculus shifts, however, when the tenant seeking to deny entry is no longer present. His objection loses its force because he is not there to enforce it, or perhaps (if we understand the Court's rationale correctly) because the affront to his authority to assert or waive his privacy interest is no longer an issue.

United States v. Henderson, 536 F.3d 776, 783-784 (7th Cir. 2008).

In the instant case, the testimony is clear that Defendant objected to the search. Tr. at 13, 18. This is not disputed by the Government. Gov't Supp. Br. at 9 (Dkt. 27) ("even though defendant objected to the search of the residence, he was not present and objecting"). Defendant voiced his objection to the search, stood outside the house for some time while the officers spoke to his mother, and – when his mother granted consent to the search – Defendant ran several houses down and waited there. The Flint police officers then entered the house and conducted the search.[1] Therefore, Defendant voluntarily left the vicinity of the residence – he was not arrested or otherwise involuntarily removed.[2]

---

[1] Defendant also argues that Officer Jackson entered the house before consent to search was given. Defendant bases this argument on Lieutenant Thomas's testimony that when he arrived at the residence, Officer Jackson "was standing inside the side door talking to Mrs. Phillips." Tr. at 40. However, even if Officer Jackson's position standing inside the side door constituted an unlawful entry into the house, there was no evidence that was obtained as result of this entry. Therefore, it is unclear to the Court what Defendant seeks to suppress from Officer Jackson's alleged entry into the house. In this context, Officer Jackson's alleged entry into the house would be analyzed as a "prior illegal search" that is not relevant "in the abstract," but only "in determining whether the suspect believed in the moment that refusal to consent would be futile." See United States v. Cochrane, 702 F.3d 334, 343 (6th Cir. 2012). However, because the Court concludes on other grounds that the subsequent search of the house, during which the officers found the firearms, was invalid, the Court need not reach the issue of the legality of Officer Jackson's alleged initial entrance into the house.

[2] Although Defendant alleges that he was arrested without probable cause when the officers took him to the car to run a LEIN check, there was no evidence presented that Defendant was put in the car or otherwise detained. Furthermore, even if taking Defendant to the car constituted an arrest, Defendant was subsequently released when the officers completed the LEIN check and Defendant, after standing in the yard for some time, ran several houses down. Finally, although Defendant contends that the officers made it clear he should stay away from the house, there was no evidence presented to support that assertion. Therefore, Defendant voluntarily left the

Because Defendant voluntarily left the premises, this case is not directly analogous to Murphy, Hudspeth, and Henderson, in which the defendants were arrested and removed prior to the search being conducted. Regardless, the Court finds convincing the holding of the Ninth Circuit: "Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects." Murphy, 516 F.3d at 1125. The Court concludes that a person's objection to a warrantless search does not lose its validity solely because a co-resident consents to the search and the objecting tenant leaves, or is removed from, the premises. A person's objection to a warrantless search remains valid unless it is withdrawn by the objector.

To hold otherwise would entail concluding that a person who denies consent to a search must then remain at his residence if he wishes his objection to remain in effect; if he leaves, it would be at the risk that a co-resident would consent to a search and admit the police officers. In other words, the officers would be vested with the power to compel an objecting suspect to remain in his house if he desires his objection to remain valid. The Court cannot discern any Fourth Amendment purpose that would be fulfilled by imposing this condition on an objecting suspect's right to freedom from a warrantless search to which he does not consent. Furthermore, imposing such a condition would lead to the inequitable result that a person who shares a residence with others must remain on the premises to maintain his objection to a search, whereas a person who lives alone could come and go as he pleases.

The Randolph Court emphasized that "customary social usage" has a substantial bearing on the Fourth Amendment reasonableness analysis in this context. Randolph, 547 U.S. at 121. The Supreme Court applied this analysis to the question of whether "customary social

---

premises.

understanding" provides a consenting tenant with sufficient authority to override the objection of a co-tenant. An analysis of customary social usage is equally applicable to the issue of whether a person's objection to a search remains valid if the person then leaves the residence and a co-tenant consents to the search.

The Court concludes that customary social understanding supports the view that a person's objection to a search remains valid under those circumstances. If a resident forbids a third party from entering his home, and if, after the resident leaves, a co-occupant then tells a third party he may enter the premises, there is no clear social custom that would allow the third party to enter. If anything, social custom would point against allowing the third party to enter in these circumstances. It is not typically understood that a co-resident's objection has been withdrawn simply because the objector has left the premises. Nor is it typically understood that the objector has subordinated his objection to the will of his co-resident who might wish to allow the third party to enter the premises. Under these circumstances, consent to enter a home remains disputed, and as the <u>Randolph</u> Court stated, "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches private living quarters over a resident's objection." <u>Randolph</u>, 547 U.S. at 120. Therefore, customary social usage supports this Court's conclusion that a person's objection to a search of his residence remains in effect unless that person affirmatively withdraws his objection.

At most, customary usage may be ambiguous regarding the continuing effectiveness of an absentee's prior objection. But under traditional Fourth Amendment principles, surrender of the privacy protection of the Fourth Amendment under the doctrine of consent must be "unequivocal." <u>United States v. Canipe</u>, 569 F.3d 597, 602 (6th Cir. 2009) (government bears

11

burden of proving consent was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress and coercion"). A co-tenant's privacy interest under the Fourth Amendment is deserving of no less protection than the privacy interest of a solo occupant; thus the same high threshold of "unequivocal" consent should be applicable in the context of analyzing whether the absentee co-tenant's objection deserves continued respect once he has left the premises. Here, Defendant's abandonment of his objection is clearly not unequivocal and, therefore, should remain effective.

It is true, as the courts in Hudspeth and Henderson stated, that the Randolph Court referred multiple times to the "express refusal of consent by a physically present resident." However, this Court's understanding of the emphasis on physical presence is that the Randolph Court was drawing the following distinction: "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Randolph, 547 U.S. at 121. In other words, the Court was clarifying that police officers need not "take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." Id. at 122. Thus an officer is not required to seek out all possibly objecting co-tenants of a residence before entering, as long as one co-tenant consented to the search; however, a co-tenant who is already "physically present" – who is "in fact at the door" – can lodge a valid objection. This is separate from the issue of whether a co-tenant's objection remains valid if he subsequently leaves and another tenant grants consent – an issue not addressed by Randolph.

For these reasons, the Court concludes that Defendant's objection to the search was not invalidated by Mrs. Phillips' consent and Defendant's leaving the premises. Although Defendant

voluntarily left, nothing in the testimony indicates that by leaving, Defendant manifested an intent to waive his objection. At the evidentiary hearing, neither Trooper Girke nor Lieutenant Thomas testified that they thought that Defendant, by running several houses away, was waiving his objection. Furthermore, nothing in social custom indicates that an objecting resident's departure from his house is a clear communication, to the co-resident and to the third party seeking entrance, that the resident is withdrawing his objection. Simply leaving the premises, without more, is insufficient to convey to anyone that the objector has changed his position and now consents to the entry.

For the above reasons, the Court concludes that the warrantless search was not valid on grounds of consent.[3]

**B. Exigent Circumstances**

The Government argues that regardless of the consent issue, there were exigent circumstances justifying a search of the residence. Gov't Resp. Br. at 11-12. The Government argues that there was an exigency because the officers reasonably believed "that a firearm was in the residence, that defendant had immediate access to the residence, and that defendant had a willingness to use the weapon." Id. at 12.

---

[3] This Court's conclusion does not conflict with United States v. Johnson, 656 F.3d 375, 378-379 (6th Cir. 2011). In Johnson, the Sixth Circuit held that the consent to search by a person with a superior possessory interest in the property does not override an express objection to the search by a person with an inferior interest in the property, absent some recognized hierarchical relationship. The court further held that the "particular arrangement of adult co-occupants – a grandmother-in-law, mother-in-law, wife, and husband – does not fall within any recognized hierarchy." Id. (citation and quotation marks omitted). Under this analysis, there was no recognized hierarchy among Defendant and his mother, who are both adults; therefore, Mrs. Phillips' consent would not override Defendant's objection. The Government does not dispute this. Gov't 2d Supp. Br. at 3 (Dkt. 29) ("[i]f the court believes that defendant's conduct satisfied the Randolph requirement of being both present and objecting, then it is clear to the government that his mother's consent, even though she has a greater possessory interest in the property, is not valid as to defendant.").

13

Defendant argues that no exigent circumstances existed to justify the search. Def. Br. for Mot. to Supp. at 6. He contends that there was no indication that anyone in the house was in danger, and the police had already removed Defendant from the scene when the search occurred. Id.

"Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citation and quotation marks omitted). One exigent circumstance justifying a warrantless search is "a risk of danger to the police or others." United States v. Johnson, 106 F. App'x 363, 368 (6th Cir. 2004).

The Sixth Circuit has held:

> The presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent. Nabors, 901 F.2d at 1354; see Murphy, 69 F.3d at 242; Becker, 23 F.3d at 1540; United States v. Marts, 986 F.2d 1216, 1218 (8th Cir.1993); Stewart, 867 F.2d at 584; United States v. Spinelli, 848 F.2d 26, 30 (2d Cir.1988). Evidence that firearms are within a residence, by itself, is not sufficient to create an exigency to officers when executing a warrant. Nabors, 901 F.2d at 1354; Murphy, 69 F.3d at 242; Marts, 986 F.2d at 1218. However, threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence. Nabors, 901 F.2d at 1354.

United States v. Bates, 84 F.3d 790, 795 (6th Cir. 1996). See also Causey v. City of Bay City, 442 F.3d 524, 530 (6th Cir. 2006) (noting that "an exigency exists when officers can demonstrate that a suspect has a willingness to use a weapon, and . . . the firing of nine shots demonstrates such willingness.").

The Court concludes that there were no exigent circumstances justifying the warrantless search. As the Sixth Circuit explained in Bates, evidence of firearms within a residence is not, in

14

and of itself, sufficient to create an exigent circumstance. In this case, although there were reports of gunshots fired and the officers suspected firearms may be in the residence, Defendant was outside and unarmed at the time the officers were attempting to search the residence. The officers knew Defendant was unarmed because they patted him down after he left the residence. Therefore, this is not a situation where the "suspect was armed and likely to use a weapon or become violent," id. at 795, or a circumstance where an individual has shown a willingness to use a weapon and the officers do not know if the individual is armed.

Furthermore, the Government's argument that Defendant could have returned to the residence and accessed the firearms is without merit and does not justify the search. The Sixth Circuit has explained:

> The defendants also argue that other "exigent circumstances" existed that excused the warrant requirement. The defendants do not claim that immediate police action was necessary to prevent the destruction of evidence or to prevent O'Brien's escape. Rather, they claim that exigent circumstances arose from the threat to the safety of the police officers and innocent bystanders in the area. However, to justify the officers' failure to obtain a warrant, the facts must show that the threat to the officers or the public was "immediate." The undisputed facts show that from the time O'Brien retreated into the house until just before the third probe, O'Brien had taken no action against the officers. Even when he initially confronted Johnson, he did not point the gun at anyone or verbally threaten to use it. While a reasonable fact finder might infer that the officers felt threatened, there is no evidence establishing that the threat of danger was "immediate."

O'Brien v. City of Grand Rapids, 23 F.3d 990, 997-998 (6th Cir. 1994) (citations omitted). In the instant case, there was no immediate threat of danger that would justify a warrantless search; Defendant had taken no action against the officers, and had not threatened them with a weapon. Defendant was no longer in the house and easily could have been detained outside the house, away from any weapon, until a warrant was secured.

The Sixth Circuit has clarified that "[e]xigent circumstances are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to

15

obtain a warrant." United States v. Williams, 354 F.3d 497, 503 (6th Cir. 2003) (citations and quotation marks omitted). However, the Government has not shown that an immediate and serious consequence would "certainly occur."

The Court's conclusion is supported by United States v. Beasley, 91 F.3d 144 (Table) (6th Cir. 1996), in which the Sixth Circuit held that despite police suspicion of weapons hidden inside a house, the warrantless search for the weapons was unconstitutional where the officers could have removed any risk of harm by posting officers at the entrances to the house. In Beasley, officers responded to an emergency call and arrived at a residence to find several people lying in a driveway with wounds indicative of gunshots. Id. at *1. An officer entered the home to locate any other injured persons, left, and then re-entered the home to search for weapons. Id. The court held that the second entry of the home, the search, was unlawful. Id. at 3. The court stated:

> Nothing in the record indicates the existence of real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant. In fact, the record shows that the crowd was readily subdued and there is no evidence that anyone attempted to enter the house. A number of police officers were present at the scene during the time of the second entry. If there genuinely was a risk that someone from the crowd would run into the house to obtain a weapon, the government fails to explain why the police did not simply secure the area by posting officers at the entrances to the house. The police officers who took part in the subsequent entry could just as easily have secured the premises while a search warrant was obtained.

Id. at 4 (citation omitted).

As in Beasley, a number of police officers were at Defendant's residence, and the police could simply have secured the area by posting officers at the entrances to the house. Because there was no necessity to search the house, the officers' warrantless search cannot be justified on the basis of exigent circumstances.

## V. CONCLUSION

16

Because the Court concludes that both purported justifications for the search – consent and exigent circumstances – lack merit, Defendant's motion to suppress (Dkt. 16) is granted.

SO ORDERED.

Dated: March 11, 2013  
      Flint, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 11, 2013.

s/Deborah J. Goltz  
DEBORAH J. GOLTZ  
Case Manager